25-mj-4361-DHH
25-mj-4362-DHH

## AFFIDAVIT OF SPECIAL AGENT CRAIG HARVEY

I, Craig Harvey, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the United States Department of Energy (DOE) Office of the Inspector General (OIG). I have been a Special Agent with DOE OIG since September 2023, and I am currently assigned to DOE OIG's Region One Field Office, which is responsible for the area from Virginia to Maine. Prior DOE OIG, I worked as a Special Agent with the United States Department of the Army Criminal Investigation Division (November 2013 to July 2018), a Special Agent with the Federal Bureau of Investigation (FBI), Boston Division (November 2018 to June 2022), and a Special Agent with the Central Intelligence Agency OIG (June 2022 to September 2023). As a DOE OIG Special Agent, my duties include investigations of, among other matters, mail fraud, wire fraud, fraud against the government, public corruption, and money laundering. Through my career as a Special Agent with DOE OIG and previously the FBI, I have assisted and participated in the preparation and execution of multiple search and arrest warrants, including residential, vehicular, and electronic search warrants.

2.      I am presently investigating EDWARD A. DOHERTY (DOHERTY) for violations of 18 U.S.C. § 201(b)(1) (bribery) and 18 U.S.C. §§ 1343 and 1346 (wire fraud and honest services wire fraud) (collectively, the TARGET OFFENSES).

3.      I submit this affidavit in support of:

   a.   an application for a criminal complaint charging EDWARD A. DOHERTY with bribery of a public official, in violation of 18 U.S.C. § 201(b)(1) and wire fraud and honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; and

b.  an application for a warrant to search the person of EDWARD A. DOHERTY, who is more particularly described in Attachment A, for the purpose of seizing evidence, fruits, and instrumentalities of the TARGET OFFENSES, as more particularly described in Attachment B.

4.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and search warrant, and does not set forth all of my knowledge about this matter.

## BACKGROUND

5.      The United States Department of Energy's Office of Intelligence and Counterintelligence (DOE-IN) is responsible for mitigating threats to the DOE enterprise and the nation's energy security by providing unique scientific and technical intelligence and expertise. The Technical and Physical Section (TaPS) of the DOE-IN is responsible for, among other things, management and accreditation of all Sensitive Compartmented Information Facilities (SCIFs) located across the DOE Complex, including National Laboratories.

## INVESTIGATION

6.      In February 2025, a confidential informant (the CI) employed at TaPS reported that EDWARD A. DOHERTY (DOHERTY), a Security Specialist with TaPS, had offered to pay the CI cash or a percentage of the total contract award in exchange for the CI providing non-public, federal contracting information to DOHERTY which DOHERTY could use to bid on and win a contract. The CI reported that DOHERTY told TaPS coworkers that he started his own company, and was seeking to contract with the federal government.

7.      The investigation revealed that DOHERTY was employed with TaPS between November 17, 2024 and February 13, 2025. As a Security Specialist for TaPS, DOHERTY was responsible for tasks related to the management and accreditation of SCIFs. Prior to working for TaPS, DOHERTY worked as a Security Specialist at the Los Alamos National Laboratory (LANL) in New Mexico, at the DOE's Carlsbad, New Mexico Field Office, and for the Department of Defense in Bethesda, Maryland.

8.      The investigation also revealed that, on or around November 15, 2024, MAE Systems LLC (MAE) was organized in Massachusetts. According to the Secretary of the Commonwealth of Massachusetts records, the general character of the business is "consulting for federal contracts," and DOHERTY is listed a Manager of MAE.

9.      After he started working at TaPS, DOHERTY told the CI and others that he owns MAE, which provides consulting services to National Laboratories, including security assessments and corrective actions. While working at TaPS, DOHERTY solicited the CI and other TaPS employees to join MAE.

10.     On or around December 15, 2024, MAE was registered with the System for Award Management (SAM), the official United States government system for contracting.

11.     On or about February 5, 2025, DOHERTY submitted a Request for Approval of Outside Employment for review and approval. DOHERTY's Request for Approval of Outside Employment identified MAE as his prospective employer.

12.     On or about February 11, 2025, DOHERTY, using phone number 781-630-0126 (the Target Telephone Number), called the CI on the CI's personal cell phone to ask the status of the Request for Approval of Outside Employment. During the conversation, which lasted approximately 53 minutes, the CI told DOHERTY that DOHERTY could go directly to the

Office of General Counsel with any questions about the Request for Approval of Outside Employment. DOHERTY then steered the conversation towards government contracts and MAE. DOHERTY told the CI that DOHERTY had solicited staff in other DOE labs with the goal of obtaining government contracts for MAE. DOHERTY told the CI that he would pay the CI in cash or a percentage of the total contract award if the CI provided contracting information to DOHERTY which DOHERTY could use to bid on and win a contract. DOHERTY told the CI that DOHERTY is "well known for rewarding those who help me." The CI disapproved of DOHERTY's offer, refused to provide information to DOHERTY, and hung up the phone.

13.    According to records from T-Mobile, the Target Telephone Number is subscribed to Danielle Doherty at 168 North Street, Unit 1, North Weymouth, Massachusetts 02191, which is the same address listed with the Secretary of the Commonwealth for the Registered Agent for MAE. I believe based on their dates of birth that DOHERTY and Danielle Doherty may be siblings. T-Mobile records indicate that the device subscribed to the Target Telephone Number bears International Mobile Subscriber Identify (IMSI) number 310260464616235. Open source records indicate that this IMSI number is currently attached to an Apple iPhone 12 Pro.

14.    After the February 11, 2025 call, DOHERTY asked the CI for updates regarding his Request for Approval of Outside Employment multiple times. DOHERTY also wanted "something in writing" saying it is permissible for him to solicit contracts and information from the DOE, while still currently a federal employee.

15.    On or about February 14, 2025, I and DOE OIG Special Agent Jonathan Targos met with the CI, who provided the information described above and agreed to cooperate with investigators.

16.     On or about February 13, 2025, DOHERTY agreed to participate in the Deferred Resignation Program (DRP). According to the CI, February 25, 2025 was DOHERTY's last day in the office, and on that date DOHERTY again offered to pay the CI in exchange for future contracts with the DOE. The CI stated that this conversation was in person, and that the CI remained open to DOHERTY's proposition, in order to assist the DOE OIG in its investigation.

CI – Initiated Contacts with DOHERTY

17.     Prior to being formally registered as a DOE OIG informant, which occurred on or about March 19, 2025, the CI made contacts with DOHERTY that were not at the direction of, nor under the supervision of, the DOE OIG.

*March 13, 2025 Recorded Call*

18.     On or about March 13, 2025, the CI reached out to DOHERTY by text using the Target Telephone Number on March 13, 2025, asking "If I got you a $416,000 contract for consultation work regarding a A&A for one year, what would be my cut? Guaranteed 1 year, one person, $200.00/hr 40 hours a week." By "A&A," the CI meant an Advisory and Assistance Services contract, which is a type of contract where a government agency procures services from a non-governmental source to support or enhance policy development, decision-making, management, administration or program/project management and operations. The CI also texted DOHERTY about CI's plan to leave DOE after two more years, and then texted, "Just a ballpark number. Easy compliance stuff. If it goes well, it would ultimately lead to a second one in Idaho. You have to keep it totally hush hush." DOHERTY replied, "Understandable, I'm very interested. Give me 20 minutes."

19.     On March 13, 2025 at approximately 8:35 p.m., the CI used CI's work phone to record an approximately 50-minute phone conversation with DOHERTY over the CI's personal cell phone.

20.     I have reviewed the recording of the March 13, 2025 call between the CI and DOHERTY. At the time of the call, which was made by DOHERTY using the Target Telephone Number to the CI's personal phone, the CI was in Baltimore, Maryland and DOHERTY stated during the call that he was in the Boston area.

21.     DOHERTY and the CI had the following discussion during the March 13, 2025 call:[1]

DOHERTY:     Alright so going through everything it looks great, flat out, alright so I spoke to my business partner, he wants me to start at 15 percent. Um, I'll, I'll 20 percent, 20 percent is about 80 grand.

CI:     Oh no, no, not that much.

DOHERTY:     What do you want?

CI:     No, so, so I you know like just for doing this for you—

DOHERTY:     mhm

CI:     —I don't want that much. You know, I've—

DOHERTY:     —OK—

CI:     —you know like ten thousand's fine.

DOHERTY:     OK

Based on their previous discussions and my interviews with the CI, I believe DOHERTY and the CI were discussing the amount DOHERTY would pay the CI in exchange for the CI's assistance

---

[1] All excerpts of recorded conversations contained herein are drafts.

in securing a DOE contract award to MAE. The CI and DOHERTY then discussed DOHERTY's
company's role in the proposed contract. Later in the call, the CI discussed the potential for the
contract to reach $832,000, and DOHERTY responded:

DOHERTY:     Sure, so just to be very candid with you 'cause I appreciate everything
             you're doing um, if this works out you're getting more than ten grand. Flat
             out. Right, I mean you don't have to worry about anything it will simply
             just be cash. Right, um we'll figure that stuff out. So, just flat out so
             you're aware um I'm not going to sit here and play games and jerk you
             around because I appreciate you, I have always appreciated you. Um, so
             you're going to get more than ten grand alright.

CI:          Well

DOHERTY:     And if this works out for the second go around I mean you're going to be
             doing alright. And this isn't a bribe, this isn't anything such as that, you're,
             you're an advisor, you're advising me through this process right, time,
             effort, right, expertise, it's not cheap.

DOHERTY and the CI then discussed the location of the potential contract, and later discussed
the amount of the payment to the CI again:

CI:          No, the reason, the reason why I am saying this dude is like I got to play
             this totally like hush hush. I can't, I can't take you know more than five
             grand.

DOHERTY:     (UI) first of all, I am not going to put you in harm's way. Right so,
             whatever deal that we work out, you will only receive cash. End of story.
             Right.

CI:          Yeah

DOHERTY:     And we can do all the promissory notes, we can get things notarized. You
             know we can hold each other accountable. We can do all of that stuff I'm
             not worried about it. I promise you. I always fulfill my obligations. You
             know, and you're gonna, you're gonna get more than what you expect.

CI:          Yeah, I just don't want to do that and then you know take a lie detector test
             and fail it, you know what I mean.

DOHERTY:     If that's the case then you know we can create a joint account, an
             investment account, put the money in there, let it accumulate, there's all
             kinds of things that can be done.

CI:           Ok, yeah I don't know anything about that

DOHERTY:   Like, I am not going to put you in harm's way. I promise.

CI:           I gotcha, yeah I just

DOHERTY:   And I am not trying to do anything nefarious, I, you, we, you and I may have had our disagreements you know over the past, but I think you've, you know I mean well at the end of the day.

Near the end of the March 13, 2025 recorded call, the CI and DOHERTY had the following exchange:

DOHERTY:   Well, I guess, in the meantime we'll make things as easy as possible, you know, like I said, I mean, first of all I appreciate you, you know, sharing this and second of all it's gonna be more than worth your while.

CI:           Yep like I said, I'm not worried in beginning you know afterwards we will see where it goes.

DOHERTY:   Yeah we, there is plenty, like I said there is plenty of things we can do to keep this you know (UI) again without breaking any laws and you know stuff like that there's a lot of things we can do to keep maintain that ethical boundary. You know secure everything that you have to do between now and then. I'm not worried about that, and I would never put you in a position where you have to jeopardize anything.

22.    On March 19, 2025, the CI was formally opened by DOE OIG as a source and provided the usual admonishments.

*April 30, 2025 Recorded Call*

23.    On or about April 5, 2025, DOHERTY (using the Target Telephone Number) contacted the CI by text message, writing, "Hey man! Any updates since we last spoke?" The CI deflected the inquiry by texting DOHERTY that the CI was out of town and would return the next week. On or about April 13, 2025 (a Sunday), DOHERTY reached out again via text to the CI, writing, "Hey man just wanted to touch base if you have time." The CI did not respond, and on or about April 16, 2025, DOHERTY texted the CI again, "Hey [CI]! Do you have time for an

8

update?" Again, the CI did not respond, and again on or about April 28, 2025, DOHERTY texted

the CI, "I have an update I would like to share with you. Please give me a call when you can."

24.     On April 30, 2025 at approximately 1:40 p.m., the CI conducted a consensually

monitored call with DOHERTY, using the Target Telephone Number. At the time of the call, the

CI was driving from Washington, D.C. to Baltimore, Maryland, and during the call, DOHERTY

stated he was in the Boston area. I have reviewed the audio recording of the call.

25.     During the call, DOHERTY mentioned an arrangement MAE was exploring with

a current federal contractor:

> DOHERTY:    It's okay Yeah, I know you're a busy guy and I didn't think about it.
> Usually I try to send you a text before I just call you, like that. And I
> wasn't thinking. I was a little excited. So uh, So I think, you know,
> between us, there's a company, you know, [COMPANY NAME]. Um, so
> we are moving forward with a partnership agreement. Um, so we're
> gonna. We're starting the facility clearance process this week. They're
> gonna try to bring me in under a DOD [*ie.e,* Department of Defense]
> contract um that way there. And I was pretty vague with them, but, you
> know, I said there's a high probability, you know, with, with some
> upcoming changes that have occurred within DOE, you know, we could be
> considered an attractive entity for some possible sole sourcing, and having
> a facility clearance would be helpful in moving that a little faster. Um, so,
> they, they liked that. So I'm trying to set the stage as much as possible if
> and when things are able to move forward, understanding that every day is
> a new beast, so.

The CI asked DOHERTY for clarification, and Doherty explained that the company he

referenced has a federal branch. The CI asked whether the CI would have to get involved with

the company, and DOHERTY responded that the company does not have to know the CI, and as

far as DOHERTY was concerned, "it is really just…you and I," and "I've not ever once uttered

your name."

26.     At the direction of DOE OIG agents, the CI then told DOHERTY about a ruse

potential contract opportunity:

CI:                 So how about a contract? Exactly what you wanted to do. Incidents and security concern, FDRs, inquiry official and probably a bunch of stuff with regards to closeouts and maybe even corrective action stuff for 12 months at a clip at about 200k.

DOHERTY:     Okay. We can do it.

CI:                 I am, like, this close to doing it, so I have to pick from a group of people each time.

DOHERTY:     Mm.

CI:                 You know, like. Like, you'll put your name in the hat, right?

DOHERTY:     Right.

CI:                 And then there'll be, like, five other companies in the hat, but I get to pick the person or the company that gets it.

DOHERTY:     Right.

CI:                 Maybe I do it four out of six times. You see what I'm saying?

DOHERTY:     Right, yeah,

The CI then discussed personnel changes that enabled the CI to have more responsibilities, including selection of contractors. The consequences of the personnel changes were also a ruse provided to the CI by DOE OIG.

27.    DOHERTY then told the CI that the company he referenced is an "8A," and "they can be sole sourced up to four and a half million." Based on my training and experience, I know that the United States Small Business Administration certifies companies pursuant to its 8(a) Business Development Program, which is designed to help businesses owned and controlled by socially and economically disadvantaged individuals compete in the federal marketplace. DOHERTY told the CI that this could mean a larger scope than the contract which the CI was proposing:

DOHERTY:    So if there's a. If there's a larger scope, possibly. Now, just because you're asking for a larger scope doesn't necessarily mean we have to do it all at once. We could do, like, separate line items on the contract, almost like phase. Like phase one, phase two. There's so many line items, and as we go through that, like, we can kind of call in those task orders. Right. That would slowly phase in more people over time. If that's something that you think would be beneficial on your side of the house, too. And the reason why I bring that up is if we. If you could get something like that approved now, it would just save paperwork and time on the back end for either the procurement officer or you or whomever might be involved.

CI:    I can try it, but I already put the paperwork in for this one, just with those things that we already previously talked about.

28.    During the call, DOHERTY suggested that he and the CI meet for lunch so that they could "go in a little bit more detail." The CI later told DOHERTY, "And plus, don't forget, like I told you, you got me freaked out about the whole, you know, payment thing. You got to physically talk to me or show me how to put this money someplace where I don't have to account for it." DOHERTY responded, "Believe it or not, that's the easy part. But yeah, I mean, to your point, yeah, that's, I think that would be a better conversation for in person." The CI stated that he did not want to be paid by check because he would have to disclose the money, and DOHERTY responded that he could get the CI cash.

*May 15, 2025 Recorded Meeting*

29.    On or about May 1, 2025, DOHERTY, using the Target Telephone Number, texted the CI, "Here are a couple of companies that could be of value," and listed MAE and two other companies. The CI did not respond to DOHERTY's text.

30.    On or about May 14, 2025, at the direction of DOE OIG, the CI texted DOHERTY on the Target Telephone Number, "Got the SOW finalized, do you want a peek at it." Based on my training and experience, and on information I learned during this investigation, I know that "SOW" as used by the CI referred to a Statement of Work. A Statement of Work

typically is released to potential bidders when solicitation is announced and open for

competition. Until solicitation is announced, a Statement of Work is a procurement sensitive

document because any advanced notice or receipt of the document provides an unfair advantage

over competitors. DOHERTY replied to the CI, "Yes I can meet you somewhere if it's easier."

The CI texted back that he was not at work on that date, and suggested meeting for lunch. They

agreed to meet for lunch on May 15, 2025 and the CI asked DOHERTY whether he wanted the

CI to text or email pictures of the Statement of Work to DOHERTY. DOHERTY replied, "It's

your call, I don't want to put you in a rough spot." The CI then texted pictures of the Statement

of Work, which was a ruse prepared in consultation with DOE OIG and DOE contracting

officers, to DOHERTY at the Target Telephone Number and said, "Just between us." DOHERTY

replied, "It will stay between us!"

31.     On May 15, 2025, at approximately 12:30 p.m., the CI met with DOHERTY for

lunch at a restaurant in Washington, D.C. The meeting was consensually recorded, and I have

reviewed the audio and video recording of the meeting.

32.     During the lunch meeting, DOHERTY started a conversation about the bribe

payment to the CI:

| | |
|---|---|
| DOHERTY: | So the number we talked about? You know if everything works out. You know uh (UI). |
| CI: | I don't even know what your talk, are we talking about this place? |
| DOHERTY: | No no no no our thing. The the ten thousand. |
| CI: | The what? |
| DOHERTY: | Ten grand. |
| CI: | Oh yea. |

DOHERTY:   So, I already have that, set off, it's off to the side its ready to rock and roll. Once uh once we are good.

33.    DOHERTY and the CI then discussed the Statement of Work that the CI had texted to DOHERTY, and DOHERTY told the CI with respect to the bribe payment, "so it sounds like ten thousand is probably, you need more than ten thousand. That's what's going to end up happening, cause it's the right thing to do at the end of the day."

34.    Later in the meeting, DOHERTY explained to the CI how DOHERTY would get the bribe money to the CI without drawing attention:

DOHERTY:   I can have another company that I have no association with send you the money and then you can pay taxes on it. Or or I can send you amounts, in small like small, smaller denominations that way you don't have to… so here here is the thing right so anything over ten thousand is automatically flagged by treasury. In wire transfers. It's automatically flagged.

Based on my training and experience, I believe DOHERTY was referring to the Bank Secrecy Act requirement that financial institutions file a Currency Transaction Report with the Financial Crimes Enforcement Network for cash transactions in excess of $10,000.[2] *See* 31 U.S.C. § 5313.

35.    DOHERTY later explained what he meant about having another company send the CI money:

DOHERTY:   What we could do for you is, I can have an electrical company bring you on as a quote unquote consultant. I give them the money, in cash right, and they just send over a cash payment. One lump sum, it could be smaller if you want it to.

DOHERTY explained that the electrical company owed him $73,000, and stated, "I mean it's all above the board stuff, I mean it's nothing shady or illegal." DOHERTY further explained, "So then we can keep it above board. We could 1099 you that way, pay taxes…however we want to

---

[2] Because a wire transfer itself is not a cash transaction, it actually does not trigger the currency reporting requirements.

do it." I believe DOHERTY's suggestion to "1099" the CI with the electrical company is a reference to an Internal Revenue Service (IRS) Form 1099-MISC, which businesses have to file with the Internal Revenue Service to disclose certain payments to non-employees. DOHERTY and the CI continued to discuss the amount and mechanisms for the bribe payment and the size of the potential contract:

CI:        So you talking like ten grand for every 250?

DOHERTY:   How do you want to do it?

CI:        I don't know it's your show

DOHERTY:   I mean we can. I think the best way to set this up is to have the possibility of future task orders where in reading it seems like it's there to a point. So case and point right?

CI:        yeah the first one is 250 thousand, but the total nut is 4.5 million and it's just like next one next one or they could go two at a time. So that's what I was saying is it ten thousand per every 250 thousand?

DOHERTY:   yeah, yeah

CI:        Am I being too greedy?

DOHERTY:   I don't think you're being greedy. We all need to eat. You know and I think depending on how long we can keep it going, right, and the numbers get bigger and bigger and bigger, we got to figure out a better way cause at some point it would just be easier to do right? Right if there is a combination of 250s that were awarded, versus like call it like a million.

CI:        Call it what?

DOHERTY:   Call it like a million. Like maybe one day there was a million.

CI:        Yea

DOHERTY:   Versus a 250, how much, 'cause you do a 450 right?

CI:        (Nods to acknowledge)

DOHERTY:   We need to figure out a way to keep you out of hot water 'cause having the money come in through those guys is only going to work for so long.

Cause then they may say you have other employment and you didn't get it
approved what's going on. You know?

CI:         It's like that movie the accountant remember he was putting money
            through all these little shops or something

DOHERTY:    Oh yeah

CI:         And they were trying to figure out and they couldn't figure out where all
            the money was going because it was a dry cleaner it was a lot of cash
            businesses. Is that what kind of thing you're talking about?

DOHERTY:    Well they are laundering money in that but no we want to make sure that
            there is legitimacy for you that way you don't have to answer to anyone.

CI:         Yeah but what am I going to do open some offshore account or
            something?

DOHERTY:    No, you don't have to worry about any of that, I just want to make sure
            when we start funneling the cash over, it's not, you're not going to be
            sitting in a room with a light hovering over your head, you know like why
            are you consulting with an electrical company?

CI:         Oh, well I get that, that's only going to work a couple times.

DOHERTY:    Well 'cause what we could also do actually, we will just have him put you
            on his payroll, and then—

CI:         whose payroll for what?

DOHERTY:    for the company

CI:         MAE?

DOHERTY:    No

CI:         the electrician's payroll

DOHERTY:    I can just have him bring you on his payroll and then that way there, I
            mean 'cause nobody's ever going to look, but if they go talk to the owner
            who I know and am very good friends with, "Yep we use him when we
            need him." Simple

DOHERTY and the CI then discussed DOHERTY's mother's boyfriend who owns a successful

health insurance business. DOHERTY then had the idea to pay the CI through his mother's

boyfriend, because "He's not going to ask any questions. As long as I just give him the money and say hey, you're going to give this to him, OK? He owes me money too. I gave him a loan."

36.    Before leaving DOHERTY after their lunch, the CI confirmed that the Statement of Work the CI texted to DOHERTY was a "sneak peek," so that DOHERTY would have the advantage of preparing MAE's proposal in advance of other candidates. DOHERTY then confirmed with the CI how MAE's proposal should be structured:

DOHERTY:    So just to recap, so based on that scope, the one that I have, write it for 250 or less,

CI:    I have to

DOHERTY:    Yea so there are three things, so each one is basically a separate task order?

CI:    Right,

DOHERTY:    Right, so the total valuation of all of those should not exceed 750.

CI:    Right

DOHERTY:    At best.

CI:    right and the whole thing is capped out at 4 and a half million.

DOHERTY:    Yep

CI:    I mean that's the way I set it up

DOHERTY:    Yep, so 250 per FTE [*i.e.,* full time employee] essentially, got it,

CI:    Yeah

DOHERTY:    Easy

CI:    Easy peazy.

The CI then asked whether the check would be in the CI's name, and DOHERTY nodded "yes." The CI then asked whether he could set up an offshore account, and DOHERTY advised:

DOHERTY:    An offshore account, uhh I mean typically there I a lot more that goes into it but, what I don't like about, I caution people about doing stuff like that or even starting an LLC cause you will get taxed twice, right. So, the company will get taxed on me sending the money over for services rendered [DOHERTY used air quotes when he said "services rendered"] and when you draw a paycheck the money gets taxed again cause now you are a W-2 even as an owner, so you have to pay taxes twice.

CI:         Ok

DOHERTY:    Which is why like as a 1099 consultant for ACME insurance

CI:         So then I just pay the taxes on the 10 grand each time

DOHERTY:    Right or we throw you in as a W-2, we cut you for ten we deduct

CI:         No, then I have to go to the General Counsel thing to get an outside job

DOHERTY:    right, so I want to try and keep it clean and clear for you, so it's less stress on your end, and you're just simply ok so minus taxes this is what I got let's do it because 1099 technically you have to pay an entrepreneurial tax which is, I think if you're sitting at almost 40%.

Based on the recording, I believe DOHERTY's use of "W-2" was in reference to an IRS Form W-2, Wage and Tax Statement, that employers must file with the IRS for each employee from whom income, Social Security or Medicare tax is withheld. Based on DOHERTY's statements to the CI, I do not believe DOHERTY ever contemplated the CI actually doing any work for the businesses from which DOHERTY suggested the CI receive a Form 1099 or W-2. Instead, I believe DOHERTY was trying to find a way to get the bribe payment to the CI without raising any questions from the IRS or law enforcement about the payment.

*May 23, 2025 Recorded Call and Email from DOHERTY*

37.    On or about May 23, 2025 at approximately 10:11 a.m., DOHERTY, using the Target Telephone Number, sent a text to the CI stating, "I have an update when you're free." On May 23, 2025, at approximately 1:50 p.m., the CI placed a consensually recorded call to

DOHERTY, using the Target Telephone Number. The CI was located in Washington, D.C. during the call. I have reviewed the audio recording of the call.

38.     DOHERTY told the CI during the call, "this morning I finished out a BPA or proposal if you will," and the CI responded that the CI needed DOHERTY's proposal sent to the CI "ASAP." Based on my training and experience, and on the investigation to date, I know that by "BPA," the CI was referring to a Blanket Purchase Agreement (BPA). Government agencies use BPAs to fulfill recurring needs for supplies and services, essentially creating a charge account with a qualified supplier. DOHERTY asked the CI whether the CI wanted DOHERTY to send the proposal by work or personal email, and the CI responded, "Hell no! Send it to my personal."

39.     Later in the call, the CI later told DOHERTY not to forget to send the CI "whatever forms I need to fill out for 1099 or something." DOHERTY then told the CI that he (DOHERTY) had been thinking, and going through the insurance company would probably be "the best bet…for reasons we can get into another time." DOHERTY also reiterated that "the funding has already been set aside for that," which I believe to be a reference to the bribe payment DOHERTY was planning to make to the CI.

40.     DOHERTY clarified why he was sending the proposal to the CI: "if you think we need more teeth or whatever the case is, you'll see so I put four task orders on there…and the fourth one I threw on there was just to kinda throw the scent off right. Uh just to make it, you know I didn't want it to be too close right? Uh right so you'll see what I mean when you read through it." I believe based on the other conversation and the investigation that DOHERTY meant that he had made the fourth task order (SCIF Security Administration Support) in order to

conceal the CI's involvement in DOHERTY's bid proposal as the previous three task orders exactly matched the Statement of Work.

41.    At approximately 3:29 p.m. on May 23, 2025, DOHERTY sent an email from a personal Gmail account to the CI's personal email address, with the subject line "Review." In the email, DOHERTY stated, "I have attached a draft document for review and feedback. Please let me know how the document needs to be changed or improved so I can begin to take the next step." Attached to the email was a three-page document titled "Blanket Purchase Agreement Response Specialized Technical Assessment Services." The document further contained reference to "Centralized SCIF Security Compliance and Assessment Support." The Company Name was listed as MAE, and the Point of Contact was listed as DOHERTY, with the Target Telephone Number as his contact cellular phone. The proposal included four (4) "Task Orders," as DOHERTY had stated in the call earlier on May 23. The fourth task order had not been included in the Statement of Work the CI sent to DOHERTY, whereas the first three task orders were exactly the same as those in the Statement of Work.

### *May 27, 2025 Recorded Call*

42.    On May 26, 2025, the CI reported to DOE OIG that DOHERTY, using the Target Telephone Number, had attempted to call the CI at approximately 4:50 p.m. that day. The CI did not contact DOHERTY on May 26, 2025, pending further instruction from DOE OIG.

43.    On or about May 27, 2025, at approximately 10:11 a.m., DOHERTY, using the Target Telephone Number, texted the CI and stated, "Hey man let me know if you have a few minutes to chat." At approximately 11:38 a.m. on May 27, 2025, the CI placed a consensually recorded call to DOHERTY, using the Target Telephone Number. The CI was located in Baltimore, Maryland during the call. I have reviewed the audio recording of the call.

44.    DOHERTY stated to the CI during the May 27, 2025 call, "Just wanted to touch base to see if there is anything else, um, that you may need." The CI told DOHERTY to update three highlighted items and then send the document to the CI's official government email. During the call, DOHERTY brought up the anticipated payment to the CI:

DOHERTY:    Ok, umm alright so I can get that to you in the next 15-20 minutes I'm just up the road from the computer now uh heading that way, and them um so I believe uh yeah so I have all of the other thing that we talked about, I have all that stuff set up and ready to roll, so basically the intent would be to bring you on as a 1099 independent contractor. Right um and basically, you know early next year when it comes time tax season that's when the 1099 will get um drafted up. Um in the meantime I'll work with them to do small increment checks if you will.

CI:    Mmm hmm

DOHERTY:    Um that way there nothing goes over you know the threshold that would cause anything, so probably two thousand at a time might be sufficient you know we can go a little bit higher but depending on your individual finances that where it gets wonky. So, depending on your individual finances the money that you have coming and going, if you exceed a four thousand dollar threshold, for some people it's higher, um that may trip off a flag in the financial institution. Um, strictly just for tax purposes they may say well ok we have to put a flag on here that way they do whatever reporting they have at the end of the year. So, we want to mindful of all that stuff right that way were not you know muddying the waters too too much. We just want to maintain legitimacy and then over time as consistency that flag will dissolve over time and then it will become part of the normal baseline.

CI:    Ok, well can you send me the 1099 stuff so that I can fill out.

DOHERTY:    Yea so uh (UI) unnecessarily with collecting all that you 'cause I told them like listen I am in a pickle and when this moves it's going to move fast so I need to get this done quick fast and in a hurry. So, I know these folks really, really, well they are willing to work with me and all the flexibility um so I just want to make sure we get everything set up first and then we can, they are ok with worrying about the administrative things on the back end if you are.

CI:    Yea I mean what place are we talking about, the the insurance company?

DOHERTY:    Yeah, so I have the insurance company, I have a concrete company, I have an electrical company, and then as of the other day, I have a property real estate, property management company that has an LLC based out of Maryland, so I didn't even realize that um, it's actually my friend and her husband they have a property management thing out of Maryland even though they don't do anything in Maryland and I was like holy crap that's awesome. Um but yea, so we, there are options, so it's good to have the options.

Based on the investigation to date, I believe DOHERTY in this call proposed paying the CI in small increments to avoid a "flag" by a financial institution, and further ensuring that DOHERTY had various methods at his disposal (*i.e.*, companies) to disguise the bribe payment from law enforcement authorities.

45.     After the call, at approximately 12:06 p.m. on May 27, 2025, the CI received an email from DOHERTY using an MAE email address, with the subject line "Submission of Unsolicited Response for BPA Consideration." The email read, in relevant part, as follows:

On behalf of MAE Systems, I am submitting an unsolicited proposal for your review. Our submission has been developed in alignment with the scope and objectives of the federal program requirements and is intended to offer added value through our demonstrated capabilities, contract experience, and operational readiness to support your mission.

\*\*\*

The enclosed document includes a Statement of Understanding, a technical overview of our capabilities, past performance highlights, and pricing considerations. We respectfully request your review and would welcome any opportunity to discuss how our qualifications may align with your agency's requirements.

The email was signed, "Edward A. Doherty, President, MAE Systems," and listed the Target Telephone Number. Attached to the email was a revised version of the "Blanket Purchase Agreement Response," a draft of which DOHERTY had sent to the CI via their personal email addresses on or about May 23, 2025.

*June 11, 2025 Recorded Call*

46.     On or about June 1, 2025, at approximately 3:19 p.m., DOHERTY texted the CI,

asking, "Have you heard anything?" The CI responded that the CI should get feedback during the

week and would contact DOHERTY if there needs to be any editing. On or about June 6, 2025,

DOHERTY again texted the CI, asking, "Is no news good news?" The CI responded, at the

direction of DOE OIG, "No news is good news. The CO [*i.e.*, contracting officer] is on vacation.

Not to worry." DOHERTY replied, "Terrific! I'm excited for next week!"

47.     On June 11, 2025, at approximately 1:29 p.m., the CI placed a consensually

recorded call to DOHERTY, using the Target Telephone Number. The CI was located in

Baltimore, Maryland during the call. I have reviewed the audio recording of the call.

48.     During the call, the CI told DOHERTY that the CI would need to make a decision

on the BPA award on Monday (*i.e.*, June 16, 2025). At the direction of DOE OIG agents, the CI

told DOHERTY that the CI was not comfortable with receiving payment through the electrical

company, as DOHERTY had previously proposed. Also at the direction of DOE OIG agents, the

CI requested that DOHERTY make a deposit on the bribe payment before the CI awarded MAE

the BPA:

DOHERTY:    Ok, so what do you want to do so if it's easier for you I can just give you
            cash. Right and then—

CI:         —Well I'm just saying

DOHERTY:    —small increments

CI:         I'm just saying I'm pulling the string on Monday, there needs to be a
            donation Monday of some sort. To make things (UI)—

DOHERTY:    —Done—

CI:         —And you can do it through Zelle. You can just send it to my—

DOHERTY:    No you do not want to do Zelle, that is so auditable it is not even funny.

CI:         Well I mean (UI) little bit

DOHERTY:    But if you want I can.

CI:         Yeah it's just going to be a little thing, a good faith thing and then when you work out this thing with whoever cause you went from electrical company to a land like a real estate company and all this stuff like I don't know what your gonna do but just as a good faith effort for Monday for me to pull the strings to send something to Zelle with my name and cell phone number and we're off to the races.

DOHERTY:    Perfect so what I can I'll do, today or tomorrow I'll go ahead and start initiating uh I'll send something over and it will be like an arbitrary thing like car part purchase or something. You know.

CI:         Well no you just put put friend gift for friend or whatever.

DOHERTY:    Ok I can do that.

CI:         Remember, remember you can get up to ten thousand dollars in gifts for free.

DOHERTY:    Ha ha ha I forgot about that.

CI:         I mean that's that's that's like IRS 101.

DOHERTY:    Alright (UI)

CI:         That's why a lot of older people, a lot of older people today give the gifts, you know that way because instead of waiting till death. They're doing ten thousand dollar a year gifts that way to grandchildren and everything else, their children and all that stuff. So,

DOHERTY:    Yeah

CI:         I can, I'm good for ten thousand dollars before anything is even a red light

DOHERTY:    Yeah well I mean so the other thing to is the increments in which the money is being deposited. So I think we spoke before like everyone has a baseline through their own financial institutions so like tomorrow if anyone of us got like $7000 dollars above you know normal for us we would get flagged internally from the institution and then if things become wonky then they would report it. Or other things too, anything over a certain amount I believe its $10,000 dollars or five I think its $5,000

dollars now uh for the IRS anything over $5,000 dollars of deposits is flagged and reported to the IRS for tax purposes.

CI:        Right

DOHERTY:      And then so I mean there is a number of ways it can get flagged, I am trying to avoid that with you which is why I have been kind of figuring out the best way for you because what I don't want to happen and I'm not worried about the tax implications it's, it's like ok if it ever comes down to reporting well does it seem normal or kosher with your background to be you know an independent contractor or whatever for this type of company. You know versus are you a jan, if you were getting a check for being a janitor does that look compliant or fishy. You know, so I want to avoid those questions as much as possible. But

CI:        Yeah I got you. Yeah but for this first thing, that you do today or tomorrow just do whatever gift for $1000 dollars let's say and that's it.

DOHERTY:      Ok

CI:        And after we're rolling and then we will figure it out from there.

DOHERTY:      Ok

CI:        You know it's not a big deal.

DOHERTY:      Ok, yeah I can do that, I'll go into Zelle and I'll figure that out. Umm

CI:        Yeah I think all you need is my name, and my phone number and then you have my email. I mean it all pops right up its like poof done.

49.    At approximately 2:48 p.m. on June 11, 2025, DOHERTY sent $1,000 to the CI via Zelle. At approximately 10:10 p.m. on June 13, 2025, DOHERTY sent $1,500 to the CI via Zelle.

50.    On or about June 16, 2025, DOHERTY, using the Target Telephone Number, texted the CI, asking, "Did you receive anything?" The CI replied, "Received (2)."

*June 23, 2025 Recorded Call*

51.    On or about June 22, 2025 (a Sunday) at approximately 7:21 p.m., DOHERTY, using the Target Telephone Number, texted the CI, "Hey buddy! When you have a few moments,

give me a quick call thank you." DOHERTY (using the Target Telephone Number) also had tried

to call the CI on June 22, 2025, but the CI did not answer the call.

52.     On June 23, 2025, at approximately 1:39 p.m., the CI placed a consensually

recorded call to DOHERTY, using the Target Telephone Number. The CI was driving from

Washington, D.C. to Baltimore, Maryland during the call, and DOHERTY indicated during the

call that he was located "up North," which I believe to be a reference to Massachusetts, based on

the investigation to date. I have reviewed the audio recording of the call.

53.     During the call, DOHERTY explained the Zelle transfers he made to the CI:

DOHERTY:     …Um so, when I was Zelleing, there was a cap on much I can Zelle, I
             bank with Navy Federal and I called them and asked to increase the cap
             and they said it's their company policy that they can't change it. So I
             wanted to ask you to see what you wanted to do about that?

CI:          What do you mean?

DOHERTY:     Like they will only allow me to send $3000 dollars in Zelle per month.
             They will not, they will not increase the limit.

CI:          Oh, that's that's fine.

DOHERTY:     Ok

CI:          Yeah I'm not worried about that.

DOHERTY:     Alright I wanted to talk with you about it because I didn't want you to
             think I was doing something shiesty and you know 'cause I still can I can
             still send $500 dollars. I can do that now, but I just didn't want you to be
             like ok like what the heck how did this number scale back so much. You
             know?

CI:          No, no no no, I'm not worried about that.

DOHERTY:     Ok cool.

54.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that DOHERTY engaged in a scheme to pay the CI, a public official, with the corrupt intent to influence the CI to award a contract to MAE, and to influence the CI to commit or aid in committing fraud on the United States, in violation of 18 U.S.C. §§ 201(b)(1)(A) and (B), 1343 and 1346.

### PROBABLE CAUSE THAT DOHERTY WILL HAVE FRUITS AND INSTRUMENTALITIES OF THE TARGET OFFENSES ON HIS PERSON

55.     I also have probable cause to believe that DOHERTY will have evidence, fruits, and instrumentalities of violations of the Target Offenses on his person as set forth in Attachment B. Specifically, I believe that he will have on his person a cellular telephone which will contain evidence of the Target Offenses.

56.     Based on my training and experience, individuals carry their cellular telephones with them at all times, including on their person. Individuals do not typically store cellular phones in vehicles. DOHERTY can be seen with his cellular telephone in the video of the lunch meeting with the CI on May 15, 2025.

57.     I am aware that individuals frequently use computer equipment, including cellphones, to create and store records of their actions by communicating about them through email, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

58.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cellphones can now function essentially as small

computers.[3] As set forth above, DOHERTY's cellphone is a smartphone. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

59.     Here, as set forth supra, DOHERTY used his cellular device to communicate with the CI about the bribery scheme on various dates between at least as early as February 2025 and June 2025.

60.     Based upon my training and experience, individuals often store personal information, including conversations via text message or other messaging applications on their cellphones. Typically, text messages between cellphones are retained by default, unless deleted manually or via an enabled auto-delete feature. Even if users attempt to delete text messages, they often neglect to delete relevant conversations or information. Additionally, not all attempts to delete text messages are successful. Text messages may be recoverable despite a user's efforts to delete the messages. Whether or not a deleted text message is recoverable is in part dependent upon on the method and timing of the deletion, as well as the device itself. As a result, I believe that there will be communications between DOHERTY and the CI and others on his cellphone regardless of any attempts to delete them.

61.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or

---

[3] References to "computers," "computer equipment," and "computer hardware" herein are intended to include smartphones.

years after they have been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a.  Electronic files that have been downloaded to a storage medium (including the memory of a smartphone) can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.  Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media in particular, computers' internal drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.  Similarly, files that have been viewed over the internet are sometimes automatically downloaded into a temporary internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files,

and the files are overwritten only as they are replaced with more recently viewed internet pages or if a user takes steps to delete them.

62.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a.    The volume of evidence storage media including memory cards and the internal memory of smartphones—can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

    b.    Technical requirements analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search,

which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap." Smartphones can easily be remotely "wiped" removing all data and essentially returning a device to its original factory settings. Consequently, law enforcement agents may seize the computer equipment for subsequent processing elsewhere.

63.     Upon receipt of the devices described in Section 1 of Attachment B, government authorized persons will review that information to locate the items described in Section 2 of Attachment B.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

64.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, including Samsung, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

65.     Further, I know from my training and experience that certain applications (apps) that are installed on phones also incorporate biometric features to access the contents of the application. The passcode that would unlock the devices owned and controlled by DOHERTY

are not currently known to law enforcement. Thus, it may be useful to press DOHERTY's fingers to the device's fingerprint sensor or to hold the device up to DOHERTY's face in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

66.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of DOHERTY to the sensor of the devices or place the devices in front of his face for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## CONCLUSION

67.    Based on the information described above, I have probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, described in more detail in Attachment B, are located on the person of DOHERTY, described in Attachment A.

Respectfully submitted,

Craig Harvey
Special Agent
U.S. Department of Energy,
Office of the Inspector General

~~Subscribed and~~ sworn to by telephone on June 27, 2025  In accordance with Fed. R. Crim. P. 4.1.

DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

12:32 p.m.